

*In the*
*Missouri Court of Appeals*
*Western District*

| | |
|---|---|
| THE VILLAGE AT DEER CREEK HOMEOWNERS ASSOCIATION, INC., | ) ) ) ) **WD76191 Consolidated with** |
| | ) **WD76192** |
| **Respondent,** | ) |
| | ) **OPINION FILED: April 1, 2014** |
| v. | ) |
| | ) |
| MID-CONTINENT CASUALTY COMPANY, | ) ) |
| | ) |
| **Appellant.** | ) |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Marco A. Roldan, Judge

Before Division One: Cynthia L. Martin, Presiding Judge, Mark D. Pfeiffer, Judge and
Karen King Mitchell, Judge

Mid-Continent Casualty Company ("Mid-Continent") appeals a multi-million dollar judgment entered in favor of The Village at Deer Creek Homeowners Association, Inc. ("Association") in an equitable garnishment proceeding tried to the court. Because we conclude that a judgment awarded to the Association against Mid-Continent's insured, Greater Midwest Builders, Ltd. ("GMB"), was for "property damage" caused by an "occurrence" as defined in Mid-Continent's policies, and because we conclude that the

trial court did not abuse its discretion in denying Mid-Continent leave to file an amended answer, we affirm the trial court's judgment in its entirety except for paragraphs 53 and 54 which calculate the damages awarded to the Association. We exercise our discretion in accordance with Rule 84.14 to vacate and modify paragraphs 53 and 54 of the judgment to recalculate the damages awarded to the Association.

## Factual and Procedural History[1]

GMB is a real estate development company. In 1999, it began development of a subdivision in Overland Park, Kansas known as the Village at Deer Creek ("Subdivision"). The development plan envisioned the construction of 137 townhomes. GMB was both the developer of the Subdivision, and the builder/general contractor that oversaw construction of each townhome.

In its role as developer, GMB established the Association and filed a Declaration of Covenants, Restrictions, Assessments and Easements ("Declarations") for the Subdivision. The Declarations required the Association to "maintain, repair, and replace . . . the exterior portion of all Units" subject to exceptions not applicable to this case. The Declarations permitted GMB as the developer to control the Association until such time as the Declarations required the Association to be turned over to the control of homeowners. GMB controlled the Association from 1999 until January 1, 2005.

In its role as the builder/general contractor, GMB oversaw the construction of townhomes, and then sold the townhomes to individual homeowners. Homeowners

---

[1]We view the evidence in the light most favorable to the judgment. *Freight House Lofts Condo Ass'n. v. VSI Meter Services, Inc.*, 402 S.W.3d 586, 597 (Mo. App. W.D. 2013).

2

acquired their townhomes subject to the Declarations, and were required to pay dues to the Association. GMB closed its first sales of townhomes in October 2001.

Sometime in 2004, several homeowners began complaining to GMB about water leaks in their townhomes. The nature of the complaints varied. GMB tried to fix each reported leak. GMB did not suspect that the leaks were symptomatic of pervasive construction defects, and did not investigate the leaks to determine whether they were related to a common cause.

Homeowners became concerned that GMB was using the Association's funds (and thus homeowner's dues) to fix the water leaks when the homeowners believed repairs should be paid for by GMB. This and other concerns led GMB to agree to turn over control of the Association to the homeowners on January 1, 2005. As a part of the turnover of control, GMB acknowledged in writing that it would address "development related deficiencies" that were its responsibility, and that it would do so before the Subdivision was completely built out. At the time of the turnover, 41 townhomes remained to be constructed. GMB oversaw construction of the remaining townhomes, and completed the build out of the Subdivision by September 2007. During this time, the Association continued efforts to resolve "development related deficiencies" with GMB.

### The Kansas Lawsuit Filed Against GMB

On December 31, 2007, the Association and 47 homeowners filed suit against GMB in Kansas state court ("Underlying Lawsuit"). The homeowners sued GMB as the builder/general contractor of their respective townhomes, and sought damages caused by water leaks to the interior portions of their townhomes. The Association sued GMB in its

3

capacity as the developer of the Subdivision and sought damages relating to the exterior of the townhomes.

GMB notified its insurers, Mid-Continent and State Automobile Insurance Co. ("State Auto") of the Underlying Lawsuit. State Auto had written commercial general liability ("CGL") coverage for GMB for the period from November 1, 2000 to November 1, 2003.[2] Mid-Continent had written CGL coverage for GMB for the period from February 13, 2004 to February 13, 2008. There was a gap in coverage for GMB from November 2, 2003 through February 12, 2004. Both Mid-Continent and State Auto accepted defense of the claims asserted in the Underlying Lawsuit under a reservation of rights.

Prior to trial, the Association and the homeowner plaintiffs indicated their willingness to settle all claims asserted against GMB within the limits of Mid-Continent and State Auto's policies. The insurers would not agree to a settlement, and would not agree to GMB's subsequent demand to withdraw their reservations of rights. GMB terminated its insurers' defense. GMB reached an agreement with the Association and the homeowners that any recovery obtained would be collected solely from GMB's insurance coverage. In exchange, GMB agreed not to offer evidence at trial or to cross examine witnesses. The Underlying Lawsuit proceeded to a trial to the court.

The Association's expert, Laurence Fehner ("Fehner") testified about several reports he prepared between January 2008 and September 2010. He testified that the

---

[2]State Auto actually wrote coverage for GMB's parent company, Greater Missouri Builders, Inc. The trial court found that GMB was an "additional insured" under the State Auto policies.

4

exterior of each of the townhomes had been constructed using a cladding system. The cladding system, which included windows, stucco, brick, siding, flashing, and other components, was supposed to keep water from entering the townhomes. The cladding system involved the application of exterior sheeting (OSB or oriented strand board) to wood studs to which metal lathe and paper were applied and on which stucco was applied. The Association's expert identified 28 separate defects in the manner in which the exterior cladding systems of the townhomes had been constructed.[3] He prepared a spreadsheet that listed each townhome and the defects present in each townhome. He testified at length about how each defect resulted in water intrusion into the townhomes, and about the water damage caused to the townhomes as a result. The damage included damage to the exterior cladding system itself, and to other components considered to be a part of the exterior of the townhomes. For example, Fehner testified that upon inspection of one townhome that was being repaired, (the Mossinghoff home), he observed first-hand "behind the walls" damage of the nature he expected would exist in light of the construction defects he had identified. He observed rotted subfloor, rotted floor joists, rotted studs, and that brick and OSB--components of the exterior cladding system--had crumbled and disintegrated. Fehner opined that this "behind the walls" damage was a result of water intrusion caused by the construction defects. Fehner also testified that the

---

[3]For example, a one-coat stucco system was used which failed to conform to manufacturer recommendations and violated building codes. Flashing was improperly installed or was missing at several locations. A secondary weather barrier was not installed behind the stucco. Windows were not properly sealed and some were improperly installed with weep holes on the side and not on the bottom. Sealant was missing where different types of exterior material came together.

same type of damage was almost certainly present, albeit in varying degrees, in each of the 137 townhomes in the Subdivision.

Fehner's spreadsheet was used by the Association to generate bids to repair the exteriors of the townhomes. The total cost of repair exceeded $7,000,000.00.

The Kansas court in the Underlying Lawsuit concluded that the construction defects "combined with repeated and continuous exposure to weather conditions [to] create[] serious leak problem[s] and resulting damage to all of the townhomes." The court found "the defective conditions . . . may not have caused immediate damage at the time of construction or at the time of completion of each unit, but exposure of the conditions to various weather events over time after completion resulted in water intrusion that caused damage to the building components." The court found that "[t]he longer these conditions remain unrepaired the worse the damage will get." The court found that as of the date of its judgment, 72 townhomes had known water leaks and that as to "those townhomes where a leak has not yet been observed in the interior, it is highly likely . . . that water has already intruded within the building envelope of those townhomes and caused damage."

The court found that GMB breached common law negligence duties it owed to the Association in its capacity as the developer of the Subdivision as specified in the RESTATEMENT (THIRD) OF PROPERTY section 6.20, which expressly addresses a developer's duties to a homeowner's association and its members up until the developer relinquishes control of an association. Specifically, and without limitation, the court concluded that GMB, as developer, failed to use reasonable care and prudence to (i)

6

"ascertain that [the reported] water leaks and signs of water intrusion were indicative of pervasive construction defects with the building envelopes of the units;" (ii) "properly investigate the[] issues with water leaks and water intrusion;" and (iii) inspect, maintain or repair or replace defects with the building envelope on the townhomes to prevent water intrusion or avoid further water intrusion with the townhomes." The court found that property damage sustained to the exterior envelopes of each townhome:

> [O]ccurred very soon after each townhome was complete as the defective conditions in the townhome exterior were met with moisture-related weather events. This began a process whereby damage was essentially continuing and worsening over time with additional repeated moisture-related events. Visible damage was not apparent for months or years later, and in many cases not until moisture had migrated through the building components and saturated them to such an extent that evidence of water intrusion became visible within the interior of a particular townhome. In other cases the visible appearance of damage has not manifested within the interior but, regardless, the damage had already started and occurred very soon after the construction of the townhome was complete.

The court entered a judgment in favor of the Association and against GMB in the amount of $7,187,731.22, plus interest at the statutory rate of 4.75% pursuant to K.S.A. 16-204, for "the enormous damages [the Association] now faces for the repair of the exterior cladding systems of the townhomes."[4] The court also awarded judgments in favor of each of the homeowners against GMB for breach of contract and/or of expressed or implied warranty for damages to the interior of each townhome.[5]

---

[4]The court in the Underlying Lawsuit found that the Declarations required the Association to maintain and repair the exterior of the townhomes and that this included the obligation to repair the exterior cladding system.

[5]The damages awarded the homeowners were for interior damage caused by water intrusion, and did not overlap with the damages awarded to the Association.

*The Equitable Garnishment Proceeding*

Because GMB is a Missouri corporation, the Association and the homeowners filed an equitable garnishment petition against State Auto and Mid-Continent in the Jackson County circuit court pursuant to section 379.200.[6] In the suit, GMB also asserted claims against Mid-Continent and State Auto for bad faith failure to settle, breach of fiduciary duty, and breach of contract.

The homeowners settled their claims. The trial court bifurcated the Association's equitable garnishment claim from GMB's claims. The equitable garnishment claim was tried to the court.

GMB's principal, Dan Barnard ("Mr. Barnard") testified that although GMB knew about water leaks in some of the townhomes when and as they were reported by homeowners, GMB never suspected that the water leaks were caused by pervasive defects in the installation of the exterior cladding system, and did not learn this was the case until after the Underlying Lawsuit was filed. GMB had believed the leaks to be relatively routine punch list and/or warranty work typical in residential construction.

The Association called Fehner to testify in the equitable garnishment proceeding. However, because Fehner had not been endorsed as an expert, the trial court sustained the insurers' objections to all efforts to elicit testimony from Fehner about the relationship between construction defects he observed and water intrusion into the townhomes. Similarly, Fehner's spreadsheet detailing the defects in each unit was excluded from evidence. The Association presented the deposition testimony of representatives of State

---

[6]All statutory references are to RSMo 2000 as supplemented, except as otherwise noted.

8

Auto and Mid-Continent, and data about when moisture related weather events occurred over the course of build out of the Subdivision.

During its case-in-chief, Mid-Continent introduced the transcript from the trial in the Underlying Lawsuit (which included Fehner's expert testimony) into evidence. In addition, Mid-Continent introduced evidence about the water leaks reported by homeowners to GMB while it controlled the Association.

Applying Missouri law,[7] the trial court entered its judgment on January 28, 2013 ("Judgment") in favor of the Association and against State Auto and Mid-Continent for equitable garnishment. The trial court concluded that the Association met its burden of establishing coverage under the insurers' policies, and that neither insurer met its burden to establish that an exclusion in the policies applied to defeat coverage. The court concluded that 52 of the townhomes sustained damage that began during State Auto's policy periods, that 82 townhomes sustained damage that began during Mid-Continent's policy periods, and that 3 townhomes sustained damage that began after Mid-Continent's policy periods. The court allocated the judgment entered in the Underlying Lawsuit accordingly, and entered judgment in favor of the Association and against State Auto in the amount of $2,728,189.95 (52/137 of the judgment in the Underlying Lawsuit), and against Mid-Continent in the amount of $4,302,145.69 (82/137 of the judgment in the Underlying Lawsuit). The court held that each sum would bear interest at the Kansas statutory rate of 4.75% per annum from the date of the judgment in the Underlying

---

[7] The parties do not contest that Missouri law applies to the resolution of the issues on appeal in this case.

9

Lawsuit to the date of its Judgment, and at the Missouri statutory rate of 9% per annum from and after the date of its Judgment.

The trial court found that there was no just reason to delay the entry of a final judgment in favor of the Association, and concluded that its Judgment was final for purposes of appeal pursuant to Rule 74.01(b).[8]

State Auto and Mid-Continent timely appealed. Thereafter, State Auto and the Association reached a settlement, and secured this court's order of limited remand permitting the trial court to partially vacate its Judgment and to enter an amended judgment as to State Auto. The amended judgment did not alter the Judgment against Mid-Continent.

### Summary of Issues on Appeal

Mid-Continent raises four points on appeal. First, it claims it was error to find that its policies afforded coverage because the judgment in the Underlying Lawsuit in favor of the Association was not for "property damage," but was for the cost to repair defective construction. Second, it claims that the Association failed to sustain its burden to allocate the judgment in the Underlying Lawsuit between covered property damage and uncovered costs to repair defective construction. Third, it claims the trial court erred in denying it leave to amend its answer to plead that the "your work" exclusion in its

---

[8]The Judgment resolved all claims between the Association and State Auto and Mid-Continent, making it eligible for interlocutory appeal under Rule 74.01(b) as the Judgment disposed of a distinct judicial unit. *Gibson v. Brewer*, 952 S.W.2d 239, 244 (Mo. banc 1997) (holding that a trial court's designation of an interlocutory judgment as final for purposes of appeal is not controlling and is only effective if the judgment disposes of a distinct judicial unit, defined as "'the final judgment on a claim, and not a ruling on some of several issues arising out of the same transaction or occurrence which does not dispose of the claim'") (citation omitted). Typically, a "judicial unit" requires the disposition of a claim in its entirety (at a minimum), and in the case of multiple claims, the disposition of all claims seeking the same relief or remedy, in whole or in part, between the same parties. *See Buemi v. Kerckhoff*, 359 S.W.3d 16, 21-22 (Mo. banc 2011).

10

policies applied to exclude coverage. Fourth, Mid-Continent alternatively claims that it was error to find coverage for 52 of the 82 townhomes allocated to its policies because damage to those townhomes was not an "occurrence" as defined in the policies. Fifth, Mid-Continent alternatively claims that only 77 townhomes sustained property damage during its policy periods, not 82.

In this equitable garnishment proceeding, the Association as the judgment creditor in the Underlying Lawsuit bears the burden of proving (i) that it obtained a judgment against Mid-Continent's insured, GMB; (ii) that Mid-Continent's policies covered the damages awarded in the Kansas judgment; and (iii) that Mid-Continent's policies were in effect when the property damage occurred. *Taggart v. Maryland Cas. Co.*, 242 S.W.3d 755, 758 (Mo. App. W.D. 2008). The first of these essential elements is not implicated by any of the issues on appeal. The second element is implicated by Mid-Continent's first, second and fourth points on appeal. The third element is implicated by Mid-Continent's fifth point on appeal. Mid-Continent's third point on appeal implicates an issue as to which it bears the burden of proof--whether a policy exclusion applies to bar coverage. *Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 80 (Mo. App. W.D. 2005).

### Points One and Two

Mid-Continent's first and second points on appeal are premised on the assumption that the judgment in the Underlying Lawsuit in whole or in part awarded the Association damages for the cost to repair defective construction, an element of damage that Mid-

Continent contends is not "property damage" as that term is defined in Mid-Continent's policies.

*Standard of Review*

The interpretation of Mid-Continent's policies to determine whether they cover the damages awarded the Association in the Underlying Lawsuit is a question of law we review *de novo*. *Browning v. GuideOne Specialty Mut. Ins. Co.*, 341 S.W.3d 897, 899 (Mo. App. W.D. 2011). However, in reviewing any factual determinations made by the trial court as a precursor to its determination of coverage, we apply "the standard established by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)." *Id*. "Under this standard, the 'trial court's decision will be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it misstates or misapplies the law.'" *Id*. (quoting *Rissler v. Heinzler*, 316 S.W.3d 533, 536 (Mo. App. W.D. 2010)). In applying this standard, we "'must view the evidence in [the] light most favorable to the judgment and disregard all contrary evidence and permissible inferences.'" *Id*. (quoting *Rissler*, 316 S.W.3d at 536).

*Analysis*

The trial court correctly observed in its Judgment that the Association bears the burden of proving by a preponderance of the evidence that Mid-Continent's policies provide coverage for the judgment in the Underlying Lawsuit. *Penn-Star Ins. Co. v. Griffey*, 306 S.W.3d 591, 596 (Mo. App. W.D. 2010). Coverage A of Mid-Continent's policies provides that Mid-Continent "will pay those sums that the Insured becomes legally obligated to pay as damages because of . . . 'property damages' to which this

12

insurance applies."  To meet its burden, the Association was thus obligated to establish, among other things, that the judgment in the Underlying Lawsuit was for "property damages" as anticipated by Mid-Continent's policies.

The policies define "property damage" as:

a.      Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.      Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

The trial court found that the judgment in the Underlying Lawsuit was covered "property damage":

[T]he Association met its burden of proving that the underlying judgment is for "property damage" as defined in the policies.  Among other things, the corporate representatives of . . . [Mid-Continent] agreed that the underlying judgment was for "property damage," at least in part.  Moreover the underlying judgment states that the damages awarded are for the damages to the exteriors of the 137 townhomes, all of which have defective conditions that have allowed water intrusion necessitating repair of the exterior cladding systems of the townhomes.  Water intruding through the exterior cladding of the townhomes and touching or impacting the components of the structures is "property damage" because it is "physical damage to tangible property" as defined in the policies.  The evidence showed the property damage occurred to each townhome almost immediately after completion with the first moisture-related weather event, and was consistent with the finding of the underlying judgment that the damage occurred "very soon after each townhome was complete."

Mid-Continent argues that the trial court erred when it concluded that the entirety of the judgment entered in the Underlying Lawsuit was for "property damage."  It argues that the judgment in the Underlying Lawsuit "encompassed two types of cost of repair costs.  One was the cost to repair the defective work. . . .  The other was the cost to repair

13

the water damage that resulted from the defective work."  [Mid-Continent's Brief, p. 22].

Mid-Continent argues that any portion of the underlying judgment related to the cost to repair the defective work is not "property damage," and since the Association failed to allocate the underlying judgment between covered and uncovered damages, no portion of the judgment could be recovered as a matter of law.[9]

Mid-Continent relies on *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 266 F.3d 859 (8th Cir. 2001).   In *Esicorp*, an insured under a CGL policy negligently inspected and approved welds on pipe that was thereafter incorporated into a pipe system on a construction project.  *Id*. at 861.  Subsequent spot checks revealed that several of the welds were defective.  *Id*.  The general contractor who had hired the insured to inspect the welds incurred considerable cost to repair the defective welds.  *Id*.  The insured settled with the general contractor, and assigned its claim against its insurer to the general contractor.  *Id*.  The subject policy afforded coverage for "property damage" which was defined almost identically to the term as defined in Mid-Continent's policies.  *Id*. at 861-62.   The Eighth Circuit denied coverage, and held that the "costs of repairing the defective welds were not covered 'damages because of . . . 'property damage.'"  *Id*. at 863.

---

[9]Though not the argument advanced at trial, nor in its Brief, during oral argument, Mid-Continent argued that the definition of "property damage" in its policy must be read to exclude not only the cost to repair defective construction work, but as well ***all*** physical injury to tangible property caused by the construction defect.  Plainly, the definition of "property damage" in the policy does not permit this construction.  It appears that Mid-Continent's shift in theory from the time of trial to the time of oral argument represents a thinly veiled attempt to read into the definition of "property damage" (a policy term which applies to determine coverage in the first instance), the "your work" exclusion (an exclusion from coverage which must be established by the insurer).  As we discuss, *infra*, Mid-Continent was not permitted to rely on the "your work" exclusion at trial because the exclusion was not timely pled as an affirmative defense.

Here, there is no dispute that the judgment in the Underlying Lawsuit included, in some indeterminate amount, the cost to "repair" or "replace" defectively installed components of the exterior cladding system. Though Fehner's spreadsheet prepared in connection with the Underlying Lawsuit was not received in evidence in the equitable garnishment case, Fehner's testimony from the Underlying Lawsuit laboriously addressing each of the 28 construction defects therein identified was received in evidence. In that testimony, Fehner painstakingly described each defect, the number of townhomes affected by each defect, how and why the defect had resulted in water intrusion, and the nature and extent of likely water intrusion damage to the exterior cladding system and to other "behind the wall" components of the townhomes. Fehner explained in the Underlying Lawsuit that his spreadsheet was prepared with the expectation that it would be used by the Association to obtain bids to repair the defects identified. Consistent with this evidence, the trial court found in the Judgment that the judgment in the Underlying Lawsuit "purports to be only for the cost of repair of the exterior cladding of the townhomes."

Though the judgment in the Underlying Lawsuit plainly includes damages for the cost to repair the defectively installed exterior cladding system, we are not persuaded by Mid-Continent's reliance on *Esicorp*. The Eighth Circuit in *Esicorp* observed that "[i]t is significant that the defectively welded pipe sections did not collapse or burst or otherwise cause accidental injury to surrounding property as a result of [the insured's] negligent inspection." *Id*. at 862. The Eighth Circuit predicted that the Missouri Supreme Court would find "property damage," and thus coverage, had the defectively welded pipes

15

failed, "result[ing] in 'physical injury to tangible property' in at least some part of the [project]." *Id*. at 863. The scenario anticipated by *Esicorp* is presented by the facts in the case before us. The defectively installed exterior cladding system failed, permitting water intrusion which has damaged not only the components of the exterior cladding system, but also other components of the exteriors of each townhome.

Mid-Continent does not contest that the defectively installed exterior cladding in each of the 137 townhomes permitted water intrusion, "result[ing] in physical injury to tangible property." *Id*. In fact, relying heavily on the testimony of Fehner, the Kansas court found in the Underlying lawsuit that there was water intrusion in all 137 townhomes *as a result of the construction defects*. The Kansas court found:

> 82. Because of the similarity in the construction materials, means and methods used in the construction of the townhomes at [the Subdivision], *the significant water intrusion problems that have manifested in most of the townhomes has been experienced by all of them. This water intrusion has caused damages to each of the townhomes* in the community.
>
> 83. The *deficient conditions* that were and are present with the exteriors of the [Subdivision] townhomes, as noted by [Fehner] in his trial testimony, *have continuously exposed the townhomes to weather events that have resulted in and will continue to result in (until repairs are effected) water intrusion* through the weather envelope of the homes. *These repeated conditions in turn have resulted in water soaking the sheathing and framing members of the structures, with water migrating and damaging other items of property, such as drywall, interior finishes, carpeting, and interior furnishings* (as shown at trial, for instance, with regard to the Mossinghoff home).

(Emphasis added.) The Kansas court found that GMB's failure to fulfill its duties as a developer "resulted in enormous damage to the components of the townhomes, including

16

the exterior cladding systems, sheathing, framing members, floor joists, and flooring." The Kansas court's findings[10] plainly negate the applicability of *Esicorp*.

We similarly reject Mid-Continent's reliance on *Lennar Corp. v. Great American Ins. Co.*, 200 S.W.3d 651 (Tex. App. 2006), *abrogated on other grounds by Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010). In *Lennar*, coverage was sought under a CGL policy for the defective installation of an exterior insulation and finish system ("EIFS"). *Id.* at 660-61. The court held the defectively installed EIFS was not property damage. *Id*. at 678-79. The court explained its conclusion, noting:

> Here, the EIFS was not physically injured after application to the homes; the EIFS was not changed from a satisfactory state into an unsatisfactory state, or otherwise physically altered. Rather, the EIFS was already in an unsatisfactory state when applied to the homes because it is inherently defective. Therefore, the defective EIFS does not constitute "property damage."

*Id*. Plainly, the court's holding indicates that had the EIFS suffered physical injury after its installation, the court in *Lennar* would have ruled differently. The hypothetical situation addressed in *Lennar* is the reality presented by the facts in this case. The evidence established that the defectively installed exterior cladding system was "physically injured" by water intrusion. Fehner testified that he observed crumbled and disintegrated brick and OSB in the Mossinghoff home, and believed the same conditions would be found behind the walls in each of the townhomes. Moreover, the evidence established that removal of the exterior cladding system would be required to access

---

[10]Mid-Continent is bound by the judgment entered in the Underlying Lawsuit, and cannot contest or retry material facts established by the judgment. *See Assurance Co. of America v. Secura Ins. Co.*, 384 S.W.3d 224, 232 (Mo. App. E.D. 2012).

17

other parts of the "exteriors" of each to effect repairs. In *Lennar*, the court observed that the cost to remove EIFS would have been covered "property damage" had the removal been necessitated to "repair underlying water damage[s]" caused by the defective EIFS. *Id*. at 678, n. 33.

Similarly, Mid-Continent's reliance on *Auto-Owners Insurance Co. v. Pozzi Window Co.*, 984 So.2d 1241, 1248 (Fla. 2008) and *Palm Beach Grading, Inc. v. Nautilus Ins. Co.*, 434 Fed. Appx. 829 (11th Cir. 2011) is misplaced. In *Auto-Owners*, the court held that "the mere inclusion of a defective component, such as a defective window or the defective installation of a window, does not constitute property damage ***unless that defective component results in physical injury to some other tangible property***." 984 So.2d at 1248 (emphasis added). In *Palm Beach Grading,* the court observed:

> The problem with PBG's claim is that the defective pipe did not cause damage independent of the repair and replacement of the pipe. For example, the pipes never burst, caused sinkholes, or caused back-ups. Rather, PBG's claim is solely for the costs of repairing and removing the defective pipe, which is not a claim for "property damage."

434 Fed. Appx. at 831. Here, the defectively installed exterior cladding system did cause damage, not only to components of the cladding system, but also to other components of the exteriors of each townhome.

Mid-Continent concedes that water damage caused by the defective exterior cladding systems is covered "property damage" under its CGL policies. It persists, however, in its claim that any damages awarded to replace the exterior cladding system are not "property damage." Our discussion, above, dispels Mid-Continent's argument. Once defective construction causes damage, the cost to repair the damage is covered

18

"property damage."  That cost to repair damage may include the cost to replace the defective construction if it too has been damaged or must be removed to access other damaged areas.  Substantial evidence supports the conclusion that components of the defectively installed exterior cladding system were damaged by water intrusion, and that removal of some or all of the exterior cladding system will be necessary to repair water intrusion damage caused "behind the walls" of the townhomes.  As a result, the trial court did not error in determining that the judgment in the Underlying Lawsuit awarded the Association a recovery for "property damages" as that term is defined in Mid-Continent's policies.

Points one and two are denied.

## Point Four

In its fourth point, Mid-Continent alternatively argues that as to 52[11] of the 82 townhomes for which coverage under its policies was found, the trial court erred because there had not been an "occurrence" as that term is defined in the policies.

*Standard of Review*

Our standard of review for this point on appeal is the same as that employed in our analysis of Mid-Continent's first and second points on appeal.

*Analysis*

As noted, Coverage A of Mid-Continent's policies affords coverage for sums GMB was legally obligated to pay as damages for "'property damage' *to which this*

---

[11]The point relied on actually states "55" and not "52."  However, the argument portion of the brief makes it clear that Mid-Continent is complaining about the trial court's finding of coverage as to 52 townhomes.

19

*insurance applies*."  (Emphasis added.)  The insuring agreement in Coverage A provides that the insurance applies to "property damage" only if:

> (1)    The . . . "property damage" is caused by an "occurrence" that takes place in the "covered territory" . . . .

Mid-Continent's policies define "occurrence" as "an accident, including continuous and repeated exposure to substantially the same general harmful conditions."  To meet its burden to establish coverage, the Association was thus obligated to establish that the "property damages" awarded in the judgment in the Underlying Lawsuit were caused by an "occurrence" as defined in Mid-Continent's policies.

The trial court concluded in its Judgment that the Association met its burden to establish that an "occurrence" caused property damage.  It held:

> [T]he property damage was caused by an "occurrence" as defined in the policies because it was caused by the negligence of GMB, which led to "continuous or repeated exposure" of the townhome exteriors to harmful conditions with each moisture-related weather event.  Under the facts, there were separate "occurrences" at each of the 137 townhomes because each is a legally separate unit owned in fee simple by a separate owner, as shown in the [Declarations] for the [Subdivision].  In addition, at each of the separate 137 townhomes, there were separate "occurrences" each time there was a new moisture-related event that allowed for more damage to that home[] through its exterior cladding.  The evidence at trial not only showed the first moisture-related weather event at each of the townhomes, showing when there was first "occurrence" at each townhome (see [Association's] Ex. 73); but the weather records from Olathe, Kansas weather station also showed repeated moisture-related weather events at each of the townhomes, meaning additional "occurrences" with each weather event.  [citation omitted]  Accordingly, the damages awarded in the underlying judgment were caused by an "occurrence" at each of the townhomes and, in fact, there were multiple occurrences that followed each initial occurrence.

Mid-Continent argues that the trial court's finding is in error.  Mid-Continent observes that "[t]he determinative inquiry into whether there was an 'occurrence' or

20

'accident' is whether the insured foresaw or expected the injury or damages." *D.R. Sherry Constr., Ltd. v. American Family Mut. Ins. Co.*, 316 S.W.3d 899, 905 (Mo. banc 2010). It thus contends that complaints from homeowners about water leaks put GMB on notice by November 2004, such that water damage to the 52 townhomes constructed by its insured after that point cannot be characterized as an "occurrence."

Mid-Continent's argument is plainly negated by the findings in the judgment in the Underlying Lawsuit. GMB was determined to be negligent in its role as developer because, among other things, it failed to use reasonable care and prudence to "ascertain that [the reported] water leaks and signs of water intrusion were indicative of pervasive construction defects with the building envelopes of the units," and to "properly investigate the[] issues with water leaks and water intrusion." Mid-Continent's present argument thus constitutes an attack on the judgment in the Underlying Lawsuit, as it would require us to conclude that GMB knew or foresaw what the Kansas court held it negligently had not determined. It is well settled that:

> One who has undertaken to indemnify another against loss arising out of a certain claim and has notice and opportunity to defend an action brought upon such a claim is bound by the judgment entered in such action, and is not entitled, in an action against him for breach of his agreement to indemnify, to secure a retrial of the material facts which have been established by the judgment against the person indemnified.

*Assurance Co. of America v. Secura Ins. Co.*, 384 S.W.3d 224, 232 (Mo. App. E.D. 2012) (quoting 17 LEE R. RUSS, COUCH ON INSURANCE sec. 239:73 (3d ed. 1995).

> In other words, an insurer who had notice of the litigation and the opportunity to control and manage it is bound by the result of the litigation, and the judgment rendered therein is conclusive in a later action on the

indemnity contract as to those issues and questions necessarily determined in the underlying judgment.

*Id*. at 232-33 (citing *Whitehead v. Lakeside Hosp. Ass'n*, 844 S.W.2d 475, 482 (Mo. App. W.D. 1992)).

Here, the Kansas court necessarily determined that GMB breached duties owed to the Association when it failed to investigate the water leaks reported by a few of the homeowners to determine the cause of those leaks. The Kansas court found that GMB failed to ascertain that the leaks were caused by a pervasive defect in the manner in which the exterior cladding system had been and was continuing to be installed. We will not entertain Mid-Continent's effort to challenge the determination that GMB was unaware of the cause for the water leaks under the auspices of a claim of "no coverage." *Id*. at 231-32 (holding that insurer's attempt to challenge coverage in equitable garnishment proceeding on the basis that no "insured contract" existed was tantamount to an effort to contest its insured's liability to the judgment creditor, a "question [that] has already been conclusively determined").

Moreover, even if Mid-Continent was not foreclosed to contest whether GMB knew about the cause of the water leaks before 52 of the townhomes had been constructed, we would reject the argument on its merits. The trial court in the equitable garnishment proceeding was free to accept Mr. Barnard's testimony that although water leaks had been reported to him, that was not an unusual occurrence in new construction, and he had no reason to believe or expect that the leaks were a function of pervasive construction defects in the manner in which the exterior cladding system on each of the

22

townhomes had been installed. Mr. Bernard testified that GMB did not know that each townhome suffered from pervasive construction defects involving installation of the exterior cladding system until after the Underlying Lawsuit was filed. By this time, all 137 townhomes had been constructed. The only case cited by Mid-Continent to support its argument that GMB foresaw the injury or damage to 52 of the townhomes merely because it knew of isolated water leaks in some of the townhomes is *Cincinnati Ins. Co. v. Stolzer*, 2010 WL481298 (E.D. Mo. 2010) (not reported in F. Supp. 2d). Unpublished federal district court "decisions are neither binding nor persuasive precedent in Missouri courts." *State v. Ellis*, 355 S.W.3d 522, 524 n.1 (Mo. App. E.D. 2011) (citing *Thornburgh Insulation v. J.W. Terrill*, 236 S.W.3d 651, 656 n.4 (Mo. App. E.D. 2007)). In any event, the case is distinguishable. In *Stolzer*, the *cause* of property damage (soil instability) was foreseeable to the insured because a homeowner expressly asked the insured to test the soil before construction, and the insured refused. 2010 WL481298 at *6. The court thus concluded that the *result*--structural damage due to a soil condition-- was not unexpected. *Id.* Here, the *cause* of the property damage (defectively installed exterior cladding system that permitted water intrusion) was not known to GMB or the Association until after the Subdivision was built out. No one requested GMB to investigate the exterior cladding system before construction of the townhomes was completed.

"It is well-settled Missouri law that when a 'liability policy defines occurrence as meaning accident, Missouri courts consider this to mean injury caused by the negligence of the insured.'" *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 393

23

(Mo. App. E.D. 2007) (quoting *Wood v. Safeco Ins. Co. of Am.*, 980 S.W.2d 43, 49 (Mo. App. E.D. 1998)). Treating the property damages sustained due to GMB's negligence as an "occurrence" "comports with a reasonable person's expectation of liability coverage." *Assurance*, 384 S.W.3d at 235 ("'A liability policy is designed to protect the insured from fortuitous injury caused by his actions. If the injury occurs because of carelessness of the insured, he reasonably expects the injury to be covered.'") (quoting *Wood*, 980 S.W.2d at 50). The trial court did not error in concluding that the exteriors of each townhome suffered property damage as a result of an "occurrence" as defined in Mid-Continent's policies.

Point four is denied.

## Point Three

In its third point on appeal, Mid-Continent complains that the trial court abused its discretion in denying it leave to file an amended answer to plead an exclusion to coverage pursuant to endorsement CG 22 94 10 01 (the "your work" exclusion).

### *Standard of Review*

"The denial of leave to amend is within the discretion of the trial court and presumed correct." *Doran v. Chand*, 284 S.W.3d 659, 666 (Mo. App. W.D. 2009). "'[T]he burden is on the proponent to demonstrate that the trial court clearly and palpably abused its discretion.'" *Id*. (quoting *Kanefield v. SP Distrib. Co.*, 25 S.W.3d 492, 498 (Mo. App. E.D. 2000)).

*Analysis*

Mid-Continent filed a motion for leave to amend its answer on September 17, 2012, less than two months before the November 5, 2012 trial on the Association's claim for equitable garnishment.  The equitable garnishment lawsuit had been pending since March 23, 2011.  In its motion, Mid-Continent sought leave to assert that an exclusion set forth in endorsement CG 22 94 10 01 (the "your work" exclusion) applied to defeat coverage.  The Association opposed Mid-Continent's motion.  The trial court entered an order on November 1, 2012 overruling the motion.

"A party [] does not have an absolute right to file an amended petition." *Id.* at 666. The factors to be considered in determining whether to permit an amendment to a pleading include:

> 1) hardship to the moving party if leave to amend is not granted; 2) reasons for failure to include any new matter in previous pleadings; 3) timeliness of the application; 4) whether an amendment could cure any defects of the moving party's pleading; and 5) injustice to the party opposing the motion.

*Id.* (quoting *Moynihan v. City of Manchester*, 203 S.W.3d 774, 776 (Mo. App. E.D. 2006)); *Curnett v. Scott Melvin Trans., Inc.*, 903 S.W.2d 184, 193 (Mo. App. W.D. 1995).

The trial court's order denying Mid-Continent's motion for leave to amend its answer to assert an additional exclusion to coverage acknowledged these controlling principles, and went to great lengths to explain the basis for its ruling:

> The Court has considered all of the foregoing factors and, in total, the weight of the factors clearly favors denying Mid-Continent's motion for

leave. Mid-Continent seeks to add[12] as an affirmative policy defense the "your work" exclusion in its policies, and certainly there is some hardship in Mid-Continent not being able to advance an affirmative defense as there is inherently any time a party is not permitted to amend its pleading. Yet the facts demonstrate that Mid-Continent has been litigating the coverage issues in this case for over three and a half years (when the court considers Mid-Continent's previous declaratory judgment action, upon which Mid-Continent relies for its pleadings in this case),[13] yet Mid-Continent never asserted the policy defense it now seeks to present as a claim in its pleadings. This is significant because plaintiffs have shown that they deposed Mid-Continent's corporate representative in the present action understanding that the "your work" exclusion was not included as an affirmative defense (which it was not), and then discussed each and every affirmative defense in Mid-Continent's answer as part of the deposition. At no time did Mid-Continent state or suggest in the deposition that the "your work" exclusion should be included among the affirmative defenses. The first time Mid-Continent made this assertion was in its motion for leave to amend filed after discovery had closed, after dispositive motions had been filed, and approximately six weeks before trial. The Court finds Mid-Continent's motion for leave highly untimely and would operate a significant injustice to plaintiffs if granted.

We have reviewed the record, and the arguments advanced in Mid-Continent's Brief. We cannot find that the trial court "'clearly and palpably abused its discretion'" in denying Mid-Continent's motion for leave to amend. *Doran*, 284 S.W.3d at 666 (quoting *Kanefield*, 25 S.W.3d at 498).

---

[12]The trial court's order contained a footnote at this location which stated: "Contrary to Mid-Continent's argument the "your work" exclusion is not contained in its current answer, either explicitly or by reference to the policy claims it asserted in its prior declaratory judgment action."

[13]The trial court was referring to the fact that Mid-Continent filed a declaratory judgment action against GMB in the United States District Court for the District of Kansas on February 9, 2009 wherein it asserted six counts in a first amended petition, each of which purported to support a finding of no coverage for the Association's claims against GMB based on language in Mid-Continent's policies. None of the counts was predicated on endorsement CG 22 94 10 01, or even generally on the "your work" exclusion. The declaratory judgment action was stayed at GMB's request pending resolution of the Underlying Lawsuit. For reasons not explained in the record, the Kansas declaratory judgment action was subsequently dismissed by the Kansas federal court.

Mid-Continent removed the Association's equitable garnishment case to the United States District Court for the Western District of Missouri shortly after the case was filed. In the answer Mid-Continent filed following removal, it alleged as an affirmative defense that it had "no obligation to indemnify . . . GMB for the judgment [in the Underlying Lawsuit] *for each and every reason stated in [Mid-Continent's] Complaint and any amendments thereto" filed in the declaratory judgment action*. (Emphasis added.) The equitable garnishment was remanded to the Jackson County Circuit Court in July 2011.

26

Point three is denied.

## Point Five

Finally, and in the alternative to its other points on appeal, Mid-Continent argues that the trial court's judgment allocating 82/137 of the judgment in the Underlying Lawsuit to its coverage is not supported by any evidence, as only 77 townhomes experienced their first moisture-related weather event during the terms of its policies.

### *Standard of Review*

The number of townhomes that first experienced a moisture-related weather event during Mid-Continent's policy terms is a factual determination. We apply "the standard established by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)." *Browning*, 341 S.W.3d at 899. "Under this standard, the 'trial court's decision will be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it misstates or misapplies the law.'" *Id.* (quoting *Rissler*, 316 S.W.3d at 536). In applying this standard, we "'must view the evidence in [the] light most favorable to the judgment and disregard all contrary evidence and permissible inferences.'" *Id.* (quoting *Rissler*, 316 S.W.3d at 536).

### *Analysis*

In apportioning responsibility for the judgment in the Underlying Lawsuit between State Auto and Mid-Continent, the trial court found "that each of the 137 townhomes sustained actual damages at the time of the first moisture-related weather event following completion of each townhome as shown on [the Association's] Ex. 73." The trial court "applied principles of equity in apportioning the underlying judgment, and found that "of

27

the 137 townhomes" in the Subdivision, "52 townhomes sustained damage that began during State Auto's policy periods," and "82 townhomes sustained damage that began during [Mid-Continent's] policy periods," and "3 townhomes sustained damage that began after [Mid-Continent's] policy periods." The trial court's Judgment expressly cited to the Association's Exhibit 73 as the source for its findings.

Exhibit 73 is a chart that lists the townhomes that closed and first experienced a moisture-related weather event during several timeframes: each year State Auto provided coverage; the gap between the end of State Auto's last policy term and the beginning of Mid-Continent's first policy term; each year Mid-Continent provided coverage; and the period after Mid-Continent's final policy term expired. Exhibit 73 clearly and plainly identifies 52 townhomes within State Auto's policy periods; 5 townhomes within the gap in coverage period; 77 townhomes within Mid-Continent's policy periods; and 3 townhomes after Mid-Continent's final policy term expired. There is *no* evidence in the record that 82 townhomes first sustained a moisture-related weather event during Mid-Continent's policy periods.

Given the trial court's meticulous explanation in its Judgment for the apportionment of the judgment in the Underlying Lawsuit by reference to Exhibit 73, and given that the trial court neglected to mention the 5 townhomes that first sustained damage during the gap in coverage period, we believe the trial court mistakenly added the 5 townhomes from the gap period to the 77 townhomes chargeable to Mid-Continent's policy periods.

28

Whatever the explanation for the error, it is clear that no evidence supports apportioning 82/137 of the judgment in the Underlying Lawsuit to Mid-Continent. Instead, 77/137 of the underlying judgment should have been apportioned to Mid-Continent.

We vacate paragraphs 53 and 54 of the Judgment which mistakenly apportion 82/137 of the judgment in the Underlying Lawsuit to Mid-Continent. We need not remand this matter to the trial court for recalculation of the amount of damages to be awarded the Association against Mid-Continent. Because correction of the Judgment requires a simple mathematical calculation, we exercise our discretion pursuant to Rule 84.14 to modify paragraphs 53 and 54 of the Judgment and to "give such judgment as the court ought to give."

Point five is granted.

## Conclusion

The trial court's Judgment is affirmed in its entirety except for paragraphs 53 and 54 which are vacated and modified to read as follows:

53. Under the facts presented, the Court finds that, of the 137 townhomes at the Villages of Deer Creek:

- 52 townhomes sustained damage that began during State Auto's policy periods;

- 5 townhomes sustained damage that began during the gap between State Auto's policies and MCC's[14] policies;

_____

[14]The Judgment refers to Mid-Continent as MCC. We do the same in modifying the Judgment to avoid confusion.

29

• 77 townhomes sustained damage that began during MCC's policy periods; and

• 3 townhomes sustained damage that began after MCC's policy periods (see Plaintiff's Exhibit 73).

54. Accordingly, under the circumstances, as to the damages awarded to the Association in the underlying judgment -- $7,187,731.22 -- judgment should be awarded against Defendant MCC as follows:

MCC
77/137 X $7,187,731.22 = $4,039,819.74 (plus post-judgment interest on that amount at the rate of 4.75% per annum (the Kansas post-judgment interest rate as shown in the underlying judgment) from the date of the underlying judgment to the date of judgment in this case.[15]

_Cynthia L. Martin_____
Cynthia L. Martin, Judge

All concur

---

[15]"The date of judgment in this case" refers to the date the Judgment was entered by the trial court and not to the date the Judgment was modified by this Opinion.